ORRIS E. NORTHRIP, A Minor, by GEORGE
. NORTHRIP, his Next Friend, v. ELLEN A.
BURGE, and ELLEN A. BURGE, Administra-
trix of Estate of JAMES BURGE, Appellant.

Division One, March 3, 1914.

1. **DONATION CAUSA MORTIS: Essential Elements.** To con-
stitute a conditional gift of personal property *causa mortis* it is
essential that it be made in reasonable expectation of death
and that the giver shall transfer the property by an actual or
constructive delivery, subject to be defeated by revocation
during his life, or by his recovery from an existing illness, or
by his survival of the donee. In this case there is no evidence
showing a delivery, either actual or constructive, to the donee
or any one for him, at any time during the donor's life.

2. **EXPRESS TRUST: In Personal Property: No Writing: No
Trustee Named.** The Statute of Frauds does not prevent the
creation of an express trust in personal property without any
writing. By fitting terms and action on the part of the settlor,
such a trust may be created, and when completed is an exe-
cuted one, and will be enforced in equity, although voluntary.
Nor is it requisite to the validity of such a trust that a trustee
be named; for the creator may constitute himself a trustee
of a completed parol trust of personal property, and, if he names
no trustee, equity will not permit such a trust to fail because
of a want of a trustee.

3. ———: **The Three Essential Elements.** To create a valid parol
trust in personal property three things are indispensable: first,
the words of the settlor must express a declaration and grant
by him of an estate or interest containing all the essential
elements of a trust; second, there must be a definite subject-
matter of a trust; and, third, there must be a definite object
or beneficiary of the trust. These necessary requisites exclude
all voluntary executory agreements for the creation of such a
trust, as well as all unexecuted or imperfect gifts of the per-
sonal property.

4. ———: ———: **Kind of Evidence: Contents of House.** And
where the question for determination is whether a valid parol
trust in personal property has been created, the evidence that
the alleged trust was executed must be so clear, certain, com-
plete and convincing as to remove all reasonable doubt from
the mind of the chancellor; and tested by that rule, it is held

255 Mo. 41

that an old and penurious grantor in a deed, made ten days prior to his death, conveying the house and lot in which he lived, worth six or seven hundred dollars, to his sister-in-law as trustee for a neighborhood boy who had delivered milk to him and done him appreciated acts of kindness, did not intend by the deed to give to the boy $32,000 in notes and mortgages hidden in the house, the word "contents" not being used in the deed, and nothing being said by him at the time the deed was executed about its contents, and the only reference thereto being declarations by him a few days later that he wished the boy to have what was in the house.

5. ———: ———: Enlarging Terms of Deed by Subsequent Dec-laration. In the absence of any fraud or imposition upon the grantor in a deed of gift in the matter of its execution, sub-sequent declarations made by him after it was recorded at his direction, are not competent to enlarge its descriptive words or to show that it did not include all he intended to convey— for instance, such declarations are not competent to show that by a deed which simply described the lot he meant to give to the donee $32,000 in notes and mortgages hidden in the house thereon.

6. ———: ———: Practice: Trial by Jury. The verdict of a jury in suits in equity are only advisory and may be wholly dis-regarded by the chancellor. The advice of a jury may be taken on particular issues of fact wherein the finding may be made to rest upon the preponderance of the evidence. But where the issue is whether a completed parol trust in definite per-sonal property has been executed in favor of a certain bene-ficiary, the testimony necessary to establish the trust must be sufficient to dispel any reasonable doubt in the mind of the chancellor, and the court should not relegate the whole con-troversy to the jury.

Appeal from Christian Circuit Court.—*Hon. John T. Moore*, Judge.

REVERSED.

*Orin Patterson, J. T. White* and *V. O. Coltrane* for appellant.

(1) Three things must concur to raise a trust: Sufficient words to create it, a definite subject, and a definite object; and to these may be added another, viz., that the terms of the trust should be sufficiently

declared. In re Soulard, 141 Mo. 664; Banking Co. v. Miller, 190 Mo. 670; Crowley v. Crowley, 131 Mo. App. 183; Kramer v. McCaughey, 11 Mo. App. 429. (2) What are sufficient words to create a trust? (a) Equity will not convert an imperfect gift or settlement into a declaration of trust. Goodman v. Crowley, 161 Mo. 663; In re Soulard, 141 Mo. 659; Banking Co. v. Miller, 190 Mo. 640; Godard v. Conrad, 125 Mo. App. l. c. 175; 3 Pom. Eq. (3 Ed.), sec. 997, p. 1865. (b) To establish a trust there must be evidence of a clear intention of the settlor to become an accounting party. Knapp v. Publishers, 127 Mo. 77. (c) To constitute a trust, there must be either an explicit declaration of trust, or circumstances which show beyond a reasonable doubt that a trust was intended to be created. McKee v. Allen, 204 Mo. 655; Young v. Young 80 N. Y. 422, 36 Am. Rep. 634. (d) The acts must be of that character which will admit of no other interpretation than that such legal rights as the settlor retains are held by him as trustee for the donee; the settlor must either transfer the property to a trustee or declare that he holds it himself in trust. Wadd v. Hazelton, 137 N. Y. 215, 33 Am. St. 707. (e) In order to the creation of an express trust, an intention to do so must be expressed from the words used. Mulock v. Mulock, 156 Mo. 438. (f) To create a trust whether in regard to real or personal property, the act must be done with that intent, and must be manifested, by clear and unequivocal evidence. Woodford v. Stephens, 51 Mo. 443. (g) When the settlor constitutes himself trustee, "he need not use the words, 'I declare myself a trustee,' but he must do something which is equivalent to it, and use expressions which have that meaning; for however anxious the court may be to carry out a man's intention, it is not at liberty to construe words otherwise than according to their proper meaning." 3 Pom. Eq., sec. 997, p. 1867 (note), sec. 998, p. 1874 (note). (3) Evidence re-

quired to establish a declaration of trust. (a) A trust in personal property must be made to appear just as definite and clear as any express trust established in real estate by writing. Crowley v. Crowley, 131 Mo. App. 179. (b) Evidence of mere loose declarations of the person holding the legal title will not be sufficient, and testimony of verbal admissions or statements of persons, since dead, is entitled to small weight in establishing such a trust. Curd v. Brown, 148 Mo. 92. (c) "Our experience shows the ease with which declarations of a deceased person may be proved and warns not to place too great reliance upon them. Evidence of such declarations never amounts to direct proof of the facts claimed to have been admitted." Rosenwald v. Middlebrook, 188 Mo. 94; Collins v. Harrell, 219 Mo. 306; Ringo v. Richardson, 53 Mo. 395; Johnson v. Quarels, 46 Mo. 427. (d) Evidence of admissions made by the party to be charged with a trust are considered unsatisfactory, especially when they are not consistent. Crowley v. Crowley, 131 Mo. App. 178. Admissions should be supported by other circumstances going also to show the existence of the trust. Ringo v. Richardson, 53 Mo. 385; Collins v. Harrell, 219 Mo. 306; 1 Perry on Trusts (4 Ed.), sec. 147; McKee v. Higbee, 180 Mo. 299; Berry v. Hartzell, 91 Mo. 132; Garrett v. Garrett, 171 Mo. 164; Allen v. Withrow, 110 U. S. 119. (e) Of all evidence the narration of a witness of his conversation with a dead person is the weakest. 2 Moore on Facts, sec. 877, p. 1014, sec. 1050, p. 1187; Fanning v. Doan, 139 Mo. 412. (f) In order to prove such a trust it must be established by testimony so clear, strong and unequivocal as to banish every reasonable doubt from the mind of the chancellor respecting the existence of such trust. Foley v. Harrison, 233 Mo. 584; Smith v. Smith, 201 Mo. 547; Crowley v. Crowley, 131 Mo. App. 183; Reed v. Sperry, 193 Mo. 173; Curd v. Brown, 148 Mo. 92; Mead v. Robertson, 131 Mo. App. 196. (g)

Where there is a great conflict in the testimony an equity court will not undertake to decide which testimony is true. Brinkman v. Sunken, 174 Mo. 709. (h) No good reason can be perceived why the rule on the admission of statements of a testator should not apply to the admission of statements alleged to have been made by the declarant of a trust, at least as to that part of the trust which was to take effect at his death. Under certain conditions such statements are admissible, but they are not to be received or taken as proof of the truth of the facts narrated. Teckenbrock v. McLaughlin, 209 Mo. 548. (4) It would seem to be elementary law that when parties have put their agreements in writing, in the absence of accident, fraud or mistake, it is conclusively presumed that the whole engagement, and the extent and manner of their undertaking was reduced to writing. Davis v. Scovern, 130 Mo. 303. And that parol evidence of a contemporaneous oral agreement is inadmissible to show a trust outside of and in addition to the written instrument. Hall v. Small, 178 Mo. 629. Yet this case was tried in the lower court by a different rule. (5) The fact that James Burge directed Ellen Burge to deposit this money in the bank (it is not disputed that he did this as to the money deposited before the date of the deed), in his name and her name so that if he lived he could draw it out shows that he did not intend to part with his money until his death. Bank v. McKenna, 168 Mo. App. 258. (6) Plaintiff pleads, or undertakes to plead, that deceased gave him the property in controversy and told him to take possession of it at his death, thereby declaring a trust. Nor is the evidence any stronger in favor of plaintiff. Nothing more is pleaded than a gift *causa mortis,* with change of possession deferred until the death of the donor. It is the universal rule that to make such a gift valid there must be such a change of possession as to put it out of the power of the donor to repossess himself

of the property. The very fact that deceased retained control of the property is incontestable evidence of the incompleteness of the gift. Brannock v. Magoon, 141 Mo. App. 316; Gartside v. Pahlman, 45 Mo. App. 164. (7) Neither the original nor amended petition of plaintiff states facts constituting a trust. In any case the material facts should be directly and not inferentially alleged. Cook v. Putnam County, 70 Mo. 668; Sec. 1794, R. S. 1909; 4 Ency. Pl. & Pr. 605, 606. And in cases of this character it will not satisfy the requirements of the law to plead or prove an agreement of an indefinite character leaving its terms more or less to inference. "There must be no equivocation or doubt in the case. 'When a plaintiff comes into court with a case of this kind, there should be no doubt in the pleadings or in the proof as to the contract.'" Rosenwald v. Middlebrook, 188 Mo. 90; Walker v. Bohannan, 243 Mo. 136. (8) This case was not tried by the tribunal appointed by law. The statute says that issues of this kind must be tried by the court, except that the opinion of a jury may be taken on specific questions of fact. Bray v. Thatcher, 28 Mo. 132; R. S. 1909, sec. 1969.

*Hamlin & Seawell, J. P. Nixon, Thos J. Moore, S. E. Bronson* and *Frank B. Williams* for respondent.

(1) There is no legal objection to a trust in personalty being created in parol, a writing being only required for realty; nor is there any legal requirement that a third party shall be the trustee. The donor may make himself such. Bank v. McKenna, 168 Mo. App. 254; Banking Co. v. Miller, 190 Mo. 664; Watson v. Payne, 143 Mo. App. 726. Where a person *sui juris,* orally or in writing, explicitly or impliedly, declares that he holds personal property for another, he thereby constitutes himself an express trustee. Banking Co. v. Miller, 190 Mo. 664. A self-constituted

trustee is not an uncommon personage. Mize v. Bank, 60 Mo. App. 363. A complete divestiture of equitable title might be produced by a clear and unambiguous declaration to that effect, although a further disposition of the legal title was still in contemplation. Lane v. Ewing, 31 Mo. 86. The creation of a trust is but the gift of the equitable interest. An unequivocal declaration as effectually passes the title to the *cestui que trust* as a delivery passes the legal title to the donee of a gift *inter vivos*. One may constitute himself trustee by mere declaration. Banking Co. v. Miller, 190 Mo. 669. If the owner of property declares a purpose and intention of immediately divesting himself of the title to its corpus for purposes openly expressed, he in effect appoints himself trustee. Godard v. Conrad, 125 Mo. App. 175. If the donor makes himself trustee no transfer of the subject-matter of the trust is necessary. Mize v. Bank, 60 Mo. App. 364. When a trust is thus created it is effectual to transfer the beneficial interest and operates as a gift perfected by delivery. Banking Co. v. Miller, 190 Mo. 671. It is not necessary in order to declare a trust that the words "trust" and "trustee," or equivalent words should be used. If a clear intention to create a trust appears from the language used, the declaration will be sufficient, though technical words are not used. In re Soulard, 141 Mo. 664; 28 Am. & Eng. Ency. Law, 898. (2) A parol trust must be established by evidence that is convincing, and the terms must be clear, definite and complete, but it would be carrying the rule to an unreasonable and unjust length to say that the evidence of the trust must be uncontradicted. It suffices if the evidence is strong enough to thoroughly convince the chancellor that a trust was declared and that the terms of the trust were defined with clearness and certainty. Watson v. Payne, 143 Mo. App. 727. In re Soulard, 141 Mo. 662. In order to determine this question it is proper to consider the inten-

tion of the donor, the circumstances surrounding the parties, and the character of property which was made the subject of the trust. It is also proper to consider declarations and acts of the donor before or about the time of the alleged transaction for the purpose of showing his intention and the character of the act. Miller v. Clark, 40 Fed. 15; Bank v. Albee, 64 Vt. 471; Williamson v. Yager, 34 Am. St. 216. (3) When a trust is declared (in personal property), whether in a third person or the donor, it is not essential that the property be possessed by the *cestui que trust,* or even that the beneficiary should be informed of the trust. Mize v. Bank, 60 Mo. App. 364. It is no objection to the creation and validity of a trust that the enjoyment of the beneficiary's interest is postponed, provided the legal title passes to the trustee and a present interest vests. 39 Cyc. 43; 28 Am. & Eng. Ency. Law, 894. It may depend for its commencement upon the termination of an existing life or lives, or an indeterminate estate. Nichols v. Emery, 109 Cal. 323; Dunn v. Houghton, 51 Atl. 71. (4) An executed voluntary trust is enforceable in equity and is irrevocable though voluntary. Watson v. Payne, 143 Mo. App. 728. (a) A voluntary trust is defined as an obligation arising out of a personal confidence, reposed in, and voluntarily accepted by, one for the benefit of another. 39 Cyc. 28. (b) An executory trust is one that is incomplete, a promise to create a trust. Watson v. Payne, 143 Mo. App. 721. (c) An executed trust is a trust so clear and certain in all its terms and limitations that a trustee has nothing to do but to carry out all its provisions, according to its letter. Cornwall v. Orton, 126 Mo. 366. (5) It is wholly immaterial in equity cases whether instructions asked were correct declarations of law or whether they were properly or improperly refused, or whether evidence was properly admitted or excluded. Waddington v. Lane, 202 Mo. 387; Nevins v. Moore, 221 Mo. 330; Banking

Co. v. Miller, 190 Mo. 351; Davis v. Forman, 229 Mo. 46.  (6)  The petition states that Burge's house and lot were conveyed to plaintiff; that money and securities were then hidden in the walls and furniture; that after the deed was made Burge stated to plaintiff and to third persons that he had given him the house and the furniture in it and the contents of the house, and that all these things were plaintiff's and could not be taken from him, and declared to plaintiff and to third persons that the said house and furniture and everything in it belonged to plaintiff, and that he had given them to him and that they were the plaintiff's, and that he wanted plaintiff to stay right in the house and take possession of all these things as soon as the breath should leave his body, and declared and created a trust in favor of plaintiff in the said personal property hereinafter described and constituted himself trustee as to the legal title in said personal property and passed the beneficial or equitable title therein to plaintiff.  This is sufficient, with the other allegations, to constitute a cause of action.  Banking Co. v. Miller, 190 Mo. 640.  (7)  It must not be forgotten that the words uttered by James Burge by which he constituted himself trustee for the Northrip boy of the money and notes comprised in the judgment were spoken after he deeded the house to him and before the said money and notes were taken out of the house, that is, between February 15th and February 18th, 1911.  That the boy was living in said house at the time, having been brought by James Burge into his household for a purpose, as we contend, and remained there by his direction to take possession as soon as the breath should leave his body.  Burge stated plainly and clearly that he had given the house and contents— everything in it—to the boy, not that he was going to do so, but that he had done so, and that his papers and everything in the house belonged to him.  Burge had hidden in the house at the time of these declara-

tions, in places known only to himself, large sums of money and other valuables. If Burge thought by deeding his house to the boy he gave him the valuables therein, and repeated afterwards that he had given them to him and that they were his and belonged to him, this would show his intention to immediately divest himself of the beneficial title in said valuables, and his statements that he wanted the boy to stay right there and take possession as soon as the breath left his body show his purpose to retain control while he lived, postponing future enjoyment until his death. Foley v. Harrison, 233 Mo. 582. (8) It is axiomatic that the law considers that as certain which can be made certain. If the house belonged to the boy and everything in it belonged to him, and if it contained valuable property, secreted in it, the amount of which was ascertainable by mathematical calculation, then this was a sufficient designation of the subject-matter. The subject-matter was everything in the house, and that was found by the chancellor to be $32,787.

## STATEMENT.

This is a suit in equity, brought by a minor through his next friend, to establish and enforce an alleged trust in certain moneys, notes and choses in action in the hands of the administratrix of James Burge deceased. The answer of the administratrix was a general denial. The case was tried upon a change of venue in Christian county. A jury was called over the exception of defendant, and nine of their number brought in a verdict for plaintiff for $32,787, which was adopted by the court as the basis of a decree against the administratrix.

The evidence was that James Burge died in his eightieth year without any descendants; that he had lived about forty years before his death in the outskirts of Springfield; that he was a carpenter by trade and occupied a four-room dwelling, the north room

of which was constructed by himself; that he owned three other lots of ground in Springfield, all aggregating about $2000 in value; that an inventory of his estate disclosed that he had also in Springfield about $61,931.06 in money and mortgages, and $13,000 in money in the State of New York; that his death took place on the 25th of February, 1911; that on the 10th, 11th and 18th of February, 1911, $32,949 in money was taken from places in which it was hidden in his dwelling, by the defendant administratrix, who was the widow of a deceased brother, and by George T. Davies, his real estate agent, and deposited to his credit in the banks of Springfield, and afterwards included in the inventory of his estate; that mortgages, bonds and securities to the value of about $15,000 were also removed by the same persons from the places where the deceased kept them in his dwelling, and these or their proceeds were also included in the inventory of his estate; that the estate left by the deceased, with the exception of his money invested in New York, was the accumulation of a life spent in saving and self-denial and hoarding, and the bulk of it was secreted over two doors and behind a flue under a window of his residence, and in the false bottom of a workbench. He kept an account, however, in two banks, of about $9000. He appears to have been a man of few intimates in the town of Springfield, except the defendant administratrix, who was his sister-in-law, and George T. Davies, his real estate agent.

His personal habits were untidy, because of his desire to avoid every form of expense or outlay. Such a hold did that feeling take upon him that he voluntarily deprived himself of suitable clothing, a comfortable bed and a generous diet, but he was honest in all his dealings. He frequently visited the house of his sister-in-law, in whom he seems to have had full confidence. He took Thanksgiving dinner there the November before his death, and as he was unable to

be there on Christmas day she carried his Christmas dinner to his house. When he became sick enough to send for a doctor in January following, he requested the physician to send for his sister-in-law.

About four years before his death the plaintiff, then between eight and nine years old, delivered milk to him, and about one year before his death the plaintiff left at his door a May basket made out of a grape box and covered with flowers with his name on a piece of paper in the box. His declarations to others show that he appreciated this act on the part of the plaintiff.

His last illness began about the 3rd of February, 1911. On the 14th of February, at the request of the defendant, he made a deed conveying a lot to the Methodist Church; on the next day, also at her suggestion, he made a deed conveying to her, as trustee, the dwelling house and lot in which he lived, in trust, for plaintiff. On the same day, February 15, 1911, he drew a check for $1000 to his nephew, William Ayers. His sister-in-law requested him to do this because Ayers had received nothing upon the death of his mother who was the sister of James Burge. Two days before he made the deed to plaintiff, he transferred about $4500 which he had on deposit in one bank, to the joint account of himself and defendant, to the end that if he did not recover she could draw it in her own name; this was also included by her in the inventory of his estate.

There is some conflict in the evidence as to the statements made by the deceased subsequent to the making of the deed to the plaintiff. The testimony on behalf of the plaintiff touching these statements, is the basis upon which the decree was rendered. The testimony on behalf of the defendant, coupled with the claim that the testimony for plaintiff is insufficient to show any trust, is the basis upon which defendant appealed to this court. The material testimony ad-

duced by parties in support of their respective con-
tentions will be referred to and set out in the opinion
in discussing the question presented for review.

OPINION.

I.

BOND, J. (After stating the facts as above).—
There are but two possible legal viewpoints from
which to weigh the evidence in this case;
first, whether James Burge made a gift of
the personalty sued for in his last sickness
and apprehending death; or, second, whether he exe-
cuted a trust therein in favor of the plaintiff.

**Gift Causa Mortis.**

The law on the subject of donations causa mortis
has been given exhaustive research by WOODSON. J.,
speaking for this division. [Foley v. Harrison, in-
fra.] It is essential to such conditional gifts of per-
sonal property that they should be made in reason-
able expectation of death and that the giver shall
transfer the property by an actual or constructive de-
livery, subject to be defeated by revocation during his
life, or by his recovery from his existing illness or
by his survival of the donee. [Foley v. Harrison, 233
Mo. 1 .c. 518; Walter v. Ford, 74 Mo .l. c. 198; 20 Cyc.
1228-9-30-1, and cases cited; 3 Pomeroy's Equity Jur.
(3 Ed.), sec. 1146; 1 Story's Equity Jur. (13 Ed.), sec.
607A.; Seabright v. Seabright, 28 W. Va. 412.]

There is no evidence in this record showing a
semblance of delivery, either actual or symbolical, to
plaintiff or to any one for him, made by James Burge.
in his last sickness or in his lifetime. We may, there-
fore, direct our attention wholly to the relevancy of
the evidence and its probative force, as supporting the
claim of plaintiff to an executed trust in his favor to
the property in controversy.

## II.

The law on the subject of the creation of express trusts in personal property is clear and definitely settled. There is nothing in the Statute of Frauds which prevents the creation of an express trust in personal **Express Trust.** property, without any writings, by fitting terms and action on the part of the settlor of the trust, and such trust, when completed, is an executed one, and will be enforced in equity, although voluntary. Neither is it requisite to the validity of such a trust that a third person should be designated as trustee. For the settlor may constitute himself as trustee of a completed verbal trust of personal property, and if no trustee is named, equity will not allow such a trust to fail for want of a trustee. But in order to create a valid verbal or parol trust in personal property three things are indispensable; first, the words of the settlor must express a declaration and grant by him of an estate or interest containing all the essential elements of a trust; second, there must be a definite subject-matter of a trust; third, there must be a definite object or beneficiary of the trust. These necessary conditions to the existence of a completed verbal trust of personal property, exclude from that category, all voluntary executory agreements for the creation of such a trust, as well as all unexecuted or imperfect gifts of personal property. [Lane v. Ewing, 31 Mo. l. c. 86; Harris Banking Co. v. Miller, 190 Mo. l. c. 670; Goodman v. Crowley, 161 Mo. l. c. 663; In re Estate of Soulard, 141 Mo. l. c. 664; Knapp v. Publishers George Knapp & Co., 127 Mo. l. c. 77; Bank v. McKenna, 168 Mo. App. 254; Watson v. Payne, 143 Mo. App. l. c. 726; Godard v. Conrad, 125 Mo. App. l. c. 175; Mize v. Bates Co. Nat. Bank, 60 Mo. App. l. c. 363.]

The question in this case is not, whether the preponderance of the competent evidence shows that the

alleged trust was executed, but is, whether that fact is established by evidence so clear, certain, complete and convincing, as to remove all reasonable doubt in our mind on the subject; for this is the rule when parol or verbal trusts are subjects of investigation. [Allen v. Withrow, 110 U. S. 119; Foley v. Harrison, 233 Mo. l. c. 584; Smith v. Smith, 201 Mo. l. c. 547; Reed v. Sperry, 193 Mo. l. c. 173; Curd v. Brown, 148 Mo. l. c. 92; Mead v. Robertson, 131 Mo. App. l. c. 196.]

There is no doubt from the evidence in the record that James Burge expressed affection for the plaintiff and preferred to have him rather than an older person sleep at his house in the beginning of his last illness. His sister-in-law, Mrs. Burge, was called in by the doctor who began to visit James Burge on February 6, 1911. She insisted that her brother-in-law needed some one to sleep in the house (since he had declined to be moved to her house or the hospital), and she mentioned several names. His reply was, ''He did not want anybody.'' She then asked him if he would let the little boy sleep there, and he replied, ''Yes, I believe I would.'' She called at the boy's home and spoke to his mother about it and on the 7th of February a bed was fixed up for him at the home of James Burge and he slept there at night until the old man died.

On the 14th of February a night nurse, Mrs. Lane, was procured, who stayed there at night until the 23rd day of February when she was discharged for alleged cause. Mrs. Burge was constantly at the home of her brother-in-law during his illness and often spent the night there, and was advised with by him before and during his sickness, and transmitted at his direction money to New York, and was directed by him, during the early part of his illness, to deposit a check which he gave her, in their joint names, and to summon his brother who lived in New York and other relatives. She was sixty-nine years of age and was his only con-

nection who lived in Springfield. She seems to be a childless and charitable woman of excellent character. The brother and other relatives arrived in Springfield about the 21st day of February, 1911.

On the 14th of February, at the request of Mrs. Burge, the deceased made a deed of a lot to the Methodist Church. On the 15th of February, at her suggestion, he made a warranty deed to the boy, then about twelve years of age, conveying the house and lot in which he lived, worth about five or six hundred dollars. Upon the suggestion of Mr. Davies, the real estate agent, that a trustee was necessary, and at the request of the grantor, Mrs. Burge was made trustee. The deed was read over and signed and the real estate agent who prepared it was told to have it recorded that day, February 15, 1911, which was done. It contained simply a grant of the property described and made no mention of anything else. The account of the making of this deed is thus given by the draftsman:

"Q. Tell the jury about what you know about the writing of that deed? A. Well, I don't just recall the occasion of my being there and writing that deed, but I was in the room and Mrs. Burge was there and if I recollect properly the first expression, Mrs. Burge says: 'James, if you want to do something for this boy, why not deed him this place?' And he kind of hestitated a little. I don't remember what he said. 'Well,' he says, 'I don't want to be out of a home,' And she says, 'You know this isn't worth probating.' And she says: 'You ought to do something for him,' or something to that effect, and she says: 'Why not give him this?' Now I won't say positive this was an expression from him, but one time I heard this. He says: 'I want to give him some little something.' Anyhow, that expression came in during some of these conversations and I think it was at this time. She was asking him to make a deed to a woman who had been doing his washing. It was an invaluable piece

of property and I think she was asking him to make a deed to an old colored fellow down close to 'Happy Hollow,' and she says: 'He is bad off and it isn't worth much, and make him a deed to that.' And I think that was about all, and he consented to make this deed to this boy, and I says, 'The boy is under age and possibly needs a trustee,' and he might have suggested that, but anyhow he says, 'Will Ellen do?' and I says, 'I guess so,' and he says, 'Ellen, will you act?' and she says, 'I don't care,' and I wrote the deed and put in Mrs. Burge as trustee for this boy.

"Q. He signed the deed? A. Yes, sir. He says, 'I don't know whether or not I can sign my name,' and I says, 'Well, it would be better for you to sign it than to sign by a mark,' and there was a box close to him and he rested his arm on that and wrote his name."

Davies then stated that James Burge after signing the deed handed it to him and said: "Davies, hold the deed as long as I live, and if I get well I want it destroyed as though never made."

No person was present when this deed was made except Mr. Davies, the real estate agent who prepared it, his wife, Mrs. Burge, and the grantor. It was finished late in the afternoon of the 15th of February. The night nurse, Mrs. Lane, states that she had returned for duty before it was signed and observed the signing and completion of the transaction. Mr. Davies and wife and Mrs. Burge testified that nothing was said by the grantor when he executed the deed about giving the boy the "contents" of the house or furniture.

On February 21st the relatives of James Burge arrived at his house, his brother Frank and wife from New York, and his nephew William Ayers and wife from Colorado. His brother was about eighty-four years old and his presence was anxiously desired by

James Burge during his illness. He also attended to the investment of about $13,000, which money he had inherited upon the death of his sister in New York.

On February 22, 1911, James Burge talked about the disposition of his affairs in the presence of his relatives and some other persons. The boy's mother, Mrs. Lane, the night nurse, Mrs. Keen, Mr. Frank Burge and Mrs. Frank Burge, were present.

For the plaintiff, Mrs. Lane, the night nurse, testified that the doctor had explained that Mr. Burge was in condition to attend to any business that he had. That she was the "director" of the inquiries made of James Burge, and she would state what he said to the wife of Francis Burge, who would then repeat it to her husband, who was hard of hearing. She uses this language as conveying what James Burge said to her: "Well, he said to tell his brother that there was nothing here for his heirs, that it was all for the boy, and what was to be divided among the heirs was in New York." She was then questioned, and answered as follows:

"Q. When he said that, whom did you tell? A. Francis Burge's wife and she would tell her husband. James and Francis was hard of hearing. I could understand James and she couldn't, and he would tell me and I would tell her and she would talk to Francis.

"Q. When he made that statement what did he do? A. They didn't do anything.

"Q. Was that all there was to that? A. That is all there was to it. I told them.

"Q. What was the condition of his mind all along then? A. It was just perfect. He had full possession of his mind; yes, sir.

"Q. That was on Wednesday, the 22nd, Washington's birthday? A. Yes, sir.

"Q. Did Mr. Burge know what day that was? A. Yes, sir.

"Q. Tell the jury how? A. When I was giving him his bath that morning he seemed to be so much better. I asked him if he knew what day of the week it was, and he said: 'Wednesday.' And I says: 'You can't tell what day of the month.' And he says: 'It is the 22nd of February, and the greatest man that was ever born was born on that day.'

"Q. When was the first time they mentioned the property? A. The 22nd.

"Q. That was on Wednesday afternoon? A. Yes, sir.

"Q. Have you told the whole conversation that took place Wednesday afternoon? A. I think so.

"Q. Was anything said about his property in New York? A. Yes, sir. He said the property in New York was for the heirs.

"Q. Did he mention any real estate besides the house and lot there? A. He said the contents of the building.

"Q. Did he mention any other real estate? A. No, sir; just the contents.

"Q. Did he say anything about any other house and lots? A. Not there that day.

"Q. Did he mention any other house and lots beside that one he made the deed to? A. No, sir.

"Q. Did he say anything about money in the bank there? A. No, sir; there wasn't any money in the bank that I know of.

"Q. He didn't mention any? A. No, sir.

"Q. Did he tell you about what form his property was in? A. No, sir; he never said anything about that.

"Q. Did he tell you whether or not he owned any bills of any kind? A. No, sir.

"Q. Or any notes or mortgages? A. No, sir.

"Q. Did he ever tell you how much property he had and how much money he had? A. No. sir.

"Q. Did he ever tell you how much he had given the boy? A. No, sir.

"Q. Did he ever tell you the worth of the property he gave the boy? A. No, sir; said money and the contents of that house. . . .

"Q. Did Mrs. Burge say anything? A. No, sir.

"Q. Did Mrs. Francis Burge say anything? A. No, sir.

"Q. Did Francis Burge manifest any surprise? A. No, sir; they didn't know there was a boy until I mentioned it.

"Q. They had been there a couple of days? A. Yes, sir.

"Q. How long were you there? A. I was there about half an hour."

Mrs. Northrip, the mother of the plaintiff, states the occurrences of the 22nd of February to have been in substance that, after the doctor had informed the relatives that James Burge did not have long to live but was in full possession of his faculties, and that they had better have him attend to any necessary business, Mrs. Frank Burge asked Mrs. Lane to talk for James Burge and she would talk for her husband Frank Burge, as they were both hard of hearing. The witness adds:

"A. Mrs. Lane asked him if there was any business he wanted to tend to, that the relatives was there, and his brother was there, and she asked him to tell Mr. Frank Burge what he had done for this little boy. And so he says: 'Well, this little boy, I have deeded my home house and lot and give him the contents of the house, is what I have give to the little boy.' And he says: 'What I have in Troy, New York, that goes to the relatives.' And he says: 'There is nothing else here for the relatives, in Springfield.'

"Q. Did he mention anything about this money that had been taken out of the house at that time?

A.   No, sir; I don't remember anything being said about the money then.

"Q.   Did the nurse speak of it?   A.   That that was taken out?

"Q.   Yes, madam.   A.   No, sir; not that I remember.

"Q.   Did you mention it?   A.   No, sir; I never mentioned anything.   I just listened.

"Q.   Was anything said about his other real estate, in Springfield?   A.   No, sir.

"Q.   Do you know he owned other real estate? A.   I heard it.

"Q.   Did he say anything about the money he had in the bank there?   A.   Nothing more.   All I heard him say about any money he said he had money to bear his expenses, but he pointed to some clothes there and says, 'I want to be buried in that suit.' And he says, 'I have money besides what I give the boy to bear my expenses.'

"Q.   Did he say where that was, or how much it was?   A.   No, sir; he didn't.   He left the impression as though it was in the bank, but I didn't know.

"Q.   Did any member of his family, his relatives, ask any question when he said there wasn't anything in Springfield for them?   A.   No, sir.

"Q.   They didn't say anything?   A.   No, sir.

"Q.   Did they manifest any surprise?   A.   No, sir; I wouldn't call it any surprise.

"Q.   Nothing was said about the fact he gave the boy everything there was in Springfield?   A.   The relatives didn't say anything.   Mr. Burge told them he had.

"Q.   I will ask you if he didn't say there at that time he wanted his brother Francis to take his personal property and divide it up among his brothers, nephews, nieces, share and share alike?   A.   No, sir.

"Q.   Didn't he say it was as simple as this: 'If you had three men and six dollars to divide, you would

give two to one, and two to another and two to the third one? A. I didn't hear that.

"Q. You would have heard it if he had said it? A. I didn't hear him say them words. He was telling he deeded his home house and lot to the little boy and give him the contents, and says: 'There is nothing else here for the relatives.' He said what was in New York was what he give the relatives, and says: 'Divide that out between the relatives.'

"Q. Did he say how it was to be divided? A. No, sir; I didn't hear it.

"Q. Did anybody ask him to make a will? A. No, sir.

"Q. Was anything said about a will? A. No, they didn't ask him to make a will. They just asked him, Mrs. Lane asked him, to explain to his brother how he wanted his business tended to.

"Q. Have you told all the conversation as far as you remember? A. Yes, sir. Mrs. Lane then left and 'phoned for Mr. Davies to come down and explain about that deed that went to the boy.

"Q. You knew at that time Mr. Davies helped rob this house? A. Yes, sir.

"Q. Why did you send for him? A. I don't know why they sent for him. I had nothing to do with it.

"Q. Did Mr. Davies come up? A. Yes, sir.

Mrs. Luella Keen, a witness for plaintiff, testified as to the statements of James Burge on the 22nd of February as follows:

"A. So Mrs. Lane taken her chair and sit by Mr. James Burge and told him what the doctor said, and she says: 'What do you want the little boy to have?' And he says: 'I have given this little boy the house and lot and the contents.' And she says: 'How soon do you want him to take possession?' And he says: 'As soon as I am gone.' And Mrs. Northrip was standing in the door and I turned to her and

made the remark, that I heard he had done this and now I know it, I hear it for myself. And someone suggested that they 'phone for Mr. Davies, and we had a 'phone, and I says, 'I will go with whoever goes.' And I went and didn't go back.'

"Q. Now, this statement of Mr. Burge in which he said he had given the house and lot and all the contents of the house to the little boy, who was present then? A. Mrs. Northrip, Mrs. Lane, Mr. Frank Burge, Mrs. Frank Burge, Jim Burge and myself.

"Q. Did they do anything or say anything when he made that statement? A. Nothing more than Mrs. Frank Burge explained to her husband."

Mrs. Agnes Burge, the wife of Francis Burge, a witness for defendant, relates what took place on the 22nd of February in the following language:

"A. Mrs. Lane came in the kitchen where we were, and said: 'Mr. Burge, James Burge would make a will.' And we all went in the room where he was and my husband says: 'James, do you want to make a will?' and he said, 'No.' And then in a few minutes he asked that they write down something, and they got a card and pencil and Mr. James Burge says: 'Now Frank you write this: ''On the 21st day of February came my brother, Francis Burge, and his wife, Agnes Burge, to Springfield to visit a brother who has been sick for some time.'' ' And he says: 'Have you got that down?' And my husband says: 'Yes, sir.' Then he says: 'Now I would like for you to write all the children's names and ages.' And Francis put that down. Then he says: 'Sign your name.' And Francis signed his name. And he says: 'Where is that boy they call my nephew?' And they called William Ayers and his wife with him. And he says: 'I would like for you to write the children's names there.' And Mrs. Ayers wrote their children's names and ages. And he said: 'Now don't that show a little affection for me, that you would come fifteen

hundred miles to see me? And we said, 'Yes.' And he said: 'Hang that up on the wall. Some time that might be framed.' And Mrs. Lane, the nurse, took the paper and hung it up on a nail. . . .

"Q. Was that about all that was said, so far as you remember? A. At that time, yes, sir.

"Q. Was the boy, Orris Northrip, mentioned? A. No, sir; he was not.

"Q. Did you at any time have any conversation, or hear any conversation, between Mr. James Burge and anyone else in regard to the disposition of his property? A. No, sir; I did not at that time.

"Q. At any time? A. Nobody else except my husband and myself.

"Q. What was the conversation that you refer to? A. Well, he told my husband he wanted him to divide all his money equal.

"Q. When was this conversation that you speak of? A. The same day we wrote the paper.

"Q. Was it at that time or later in the day? A. No, sir; it was after dinner.

"Q. Do you know how they came to engage in that conversation? A. Well, Mrs. Lane, the nurse, came out in the kitchen and she said: 'Now, if you have any business you want to talk over with Mr. Burge you better do it now, because he is in as good condition now as he ever will be, and the doctor thinks if the water reaches his heart he will die, and I want to be there when you talk to him, because he has told me his affairs and I want to be there.' And she turned and went in the room, where he was sitting in the chair, and so far as I know just my husband and myself and Mrs. Lane was all that was there.

"Q. Did your husband stand up there or sit down by him? A. He sat down by him and drew the chair close.

"Q. What was the conversation had there? A. Well, he told Francis he wanted him to divide his

money equally.  It went to his brothers, nephews and nieces.  He wanted it divided equally.

"Q.  Did he explain what he meant by equally? A.  Later in the conversation he did.

"Q.  Just tell the jury what he said? A. Well, he had been talking something about the money, and he said: 'Now, Frank, it is as simple as if you had three men sitting there and you had six dollars and give two dollars to one, and give two to that one and two to the other one.'  And he says: 'Now Frank, if you don't understand, Mr. Davies knows it all.'

"Q.  Did Mrs. Lane say anything? A.  Mrs. Lane stepped around from his rear where she had been standing.  She was rubbing or stroking his forehead, and she stepped around to the side and says: 'Mr. Burge, do you want to make the boy an heir?'  Then he says: 'Yes.'  And I says: 'James, how much do you want to give the boy?'  And he says: "Oh if you have ten dollars left, or one hundred dollars left, can't you give it to him?'  And there was no answer made.  Then Mrs. Lane says: 'Do you want the boy to have the effects here?'  and motioned her hands around that way (indicating), and he said, in a tired kind of voice: 'If he cares to have them.'  And then she asked: 'How soon do you want them to take possession?  Do you want them to take possession right away?'  And he says: 'If they want to.'  Then he says: 'Who is this talking?  And she and I both said: 'The nurse.'  And he said: 'Oh! the nurse,' and he didn't say anything more, and stopped.  That was the end of the conversation.

"Did she say anything about the contents of the house further than you mentioned?  A.  No, sir.

"Q.  Did she say anything about having previously given the boy anything?  A.  No, sir; the boy's name was not mentioned, and I never saw him speak to the boy while I was there, and I was there five days, and never saw him speak to the boy.

"Q. Did you ever hear him mention his name other than when Mrs. Lane called his attention to the boy? A. I have no recollection of hearing it.

"Q. Did you hear other or further conversation about the disposition of the property? A. Not about the disposition of the property, but I heard him say he wanted my husband to give his boys their share of the money and let them put it into their business and use it, and not to do as he had done. And he said: 'Let them build a good business with it and carry my name down decently and honorably, and not let my name die out.'"

Francis Burge, age eighty-four, the brother from New York, states the occurrences on February 22nd to have been as follows:

"Q. Was there any talk about the property that day? A. He spoke of it. He says, 'Frank,' he always called me Frank.

"Q. Do you remember how that conversation came up? A. He brought it up himself.

"Q. Just tell the facts? A. He says: 'Frank, I want you to divide all my money up between brothers, nephews and nieces. Give your boys theirs now and let them put it in their business, use it and enjoy it and build up a good business. Do not do as I have done, but that money will make them decent and honorable.'

"Q. Who was present at that conversation? A. My wife was there part of the time, and I suppose Mrs. Lane came in sometime afterwards. I don't remember of her being there when James told me that. He brought that subject up without my speaking to him.

"Q. Did he say what money was to be divided? A. He says: 'Ellen has the money. If you don't understand Frank Davies knows it all. It is as simple as it can be; if you had six dollars and three men to

share it, give two to this one, two to that one and. two
to that one.' That was his sentiment.

"Q. Was that the time Mrs. Lane would do the
talking with James, and your wife for you? A. When
they was speaking of that was the time Mrs. Lane
broke in and he thought Mrs. Burge was talking and
must have discovered the difference in the voice, and
says: 'Who is that talking?'

"Q. What did Mrs. Lane say? A. She says:
'Do you want the boy to have the effects?' stretching
out her arms this way (indicating), and James turned
his head and looked to see what there was in the room,
and says, 'Yes,' referring to what was in the room
there, the furniture."

This is the substance of all the testimony touch-
ing the declarations of James Burge during his ill-
ness.

## III.

The testimony did not present issues necessary to
be submitted to a jury as in actions at law. It would
have been correct practice for the trial
Jury Trial in judge to have submitted particular is-
Equity Cases. sues of fact to the jury whose verdict
might have assisted him in making his own finding of
the facts. But he should not deny the request of the
defendant for submission of specific questions of fact,
and then relegate the whole controversy to the jury
as he did. 'General instructions to jurors or declara-
tions of law when given in equitable actions serve no
other purpose than to indicate the mind of the judge
sitting as chancellor and the theory of equity applied
by him. The verdict of juries in such cases is only
advisory and might be wholly disregarded by the trial
judge. The questions ordinarily presented on appeal
in equity cases are, what does the preponderance of
the competent evidence show? But in exceptional

cases like the present, the sole question is whether the express trust alleged in personal property is sustained, not merely by the greater weight of the evidence, but by an amount of credible testimony sufficient to dispel any reasonable doubt in the mind of the court, as to the existence of a completed trust in reference to definite personalty and in favor of a certain beneficiary.

It is clear from the evidence in this record that the whole claim of plaintiff of a trust in the money and securities for which he obtained judgment below, is rested solely on the statements of his mother, the night nurse, and Mrs. Hillman and Mrs. Keen, two neighbors who called in to see the sick man during his last illness. The assistant night attendant, and son of Mrs. Hillman, was not called to testify. Not one of these four undertook to state anything said by James Burge before or at the time he signed and delivered the deed conveying the house and lot to the plaintiff. One of them, the night nurse, says she was present when the deceased wrote his name to the deed and acknowledged its execution. But she does not testify to a single expression made by him at the time, as to his intentions or as to the purpose of the deed or as to his purpose to make any other donations to the plaintiff. She says she first learned his intentions in that matter from what he said to her on the next morning when she was about to leave the house.

Gift of House: Contents.

It is not claimed and there is no evidence in this record to sustain such a claim, that the deceased, James Burge, was at the time of the making of the deed, on February, 15, 1911, or at any other time during his illness when he spoke of his business affairs, lacking in mental power or full comprehension of all the matters referred to by him, and of his relations to all persons present. Clearly it was not competent by his subsequent declarations to alter the terms of

his previously executed and delivered and recorded deed, or to show that it did not include all that he intended to convey, in the absence of any fraud or imposition upon him in the matter of the execution of the deed, of which there is no evidence whatever in the present record. But even if this evidence of his admissions made on the following morning to the night nurse, and substantially the same admissions to the other three witnesses for plaintiff, should be received as indicating that he had made such declarations at the time of the deed or subsequently, the question would still remain, whether the testimony as to such admissions so far outweighed the evidence contradicting them contained in this record, as to leave no reasonable doubt of the fact of the making of such admissions? We are unable to give that weight to the testimony for the plaintiff.

If there ever was a time when it would have been natural for James Burge to explain his intentions as to the plaintiff, it was when he made a deed of gift to him. His real estate agent was told to prepare the deed and after it had been written it was read over and signed by the grantor, who then directed it to be recorded that afternoon. During the whole transaction, and after its consummation, he did not utter a word indicating that he desired to give the plaintiff anything beyond the house and lot. The wife of the real estate agent was present, Mrs. Burge was present and the night nurse came in before he read over and signed the deed, and observed him doing these things. Yet he gave no hint, at that time, to any of these persons, that he desired to give the boy about $32,000 in money and notes then hidden in his house. On the contrary, within three days after the deed, he caused all of his money to be taken out and deposited in the bank. If James Burge had designed to make the plaintiff a gift of all his money and bonds still secreted in his house, and had been in full possession

of his mental faculties, as is undenied, his failure to mention that purpose on the very occasion when he was giving him a deed to his house and lot and when he knew that a part of the hidden money had been taken from the house, is incomprehensible. And when it is borne in mind that he did not rest until he got the remainder of this money taken away by Saturday the 18th, it is simply incredible that he intended to create a trust in favor of the boy by transferring that money as the "contents" of the house on the 15th of February, 1911, and making himself the trustee thereof until the boy, or some one for him, should take possession of the house and "contents" after his death.

His action in causing the removal of the money before and after the deed, makes it clear to a demonstration, that he did not intend that there should remain in his house at his death any portion of the money and securities which he had previously kept there and in the workbench. We conclude that there is an utter failure of proof in this record that James Burge designed by using (if he did use) the words *"contents" "or when I say contents I mean everything,"* to vest any title in equity in this plaintiff to the money and securities which had been taken from his home or which he caused to be taken from his house within three days after it is testified he used that language. For if he had such intention he would not have defeated it by *revealing* the secret hiding places, before and *after* making the deed and causing these "contents" to be deposited in the bank without providing that they should be turned over to plaintiff or some one for him.

We attach still less weight to the "terms" said by plaintiff's witnesses to have been used by James Burge on the 22nd of February, 1911. At that date not a dollar of his hoardings remained in his house. His mind at that time was "perfect" (according to the statement of the night nurse). He was a clear-

headed man in his business dealings. His fortune had come by toiling, saving and loaning his earnings on mortgages. He had full cognizance of the amount, nature and location of his estate. He kept the bulk of his securities and cash in this house and in his workbench, and about nine thousand dollars on deposit in Springfield banks, and about thirteen thousand invested in New York in charge of his brother. His brother and his brother's wife, and his nephew and his nephew's wife, had arrived at his home the night before. He was deeply touched by their coming to visit him, in fact his brother sat by his side on the 22nd of February and held his hands while he was expressing his wishes as to the disposal of his estate. He required his brother to make a memorandum of the names of all of his children and the names of his nephew's children, and the night nurse hung it on the wall where he said it could be thereafter framed. The testimony of his brother, his brother's wife and his sister-in-law, Mrs. Burge, is set out in full above. Their account of what was actually said and done on that occasion bears every mark of truth and naturalness, and is in our opinion substantially correct. The statement of the nurse, to the contrary, and to the effect that he then said that his property in New York was to go to his heirs and every thing he had in Springfield was to go to the plaintiff boy, does not impress us with verity or satisfy our minds that any such declarations were made by him. It could only have been prompted by dislike for his brother and nephew and niece of which there is not the faintest evidence in the record. We do not believe that he made statements so intrinsically improbable as the one testified to by the night nurse. This witness was shown to be without reputation for chastity and twice divorced and suspected of having been indiscreet in connection with a son of Mrs. Hillman, who was assisting her in waiting on the sick man. She was dis-

charged from service on the 23rd of February for officiousness if not misconduct. Her version of the affair does not show candor, sincerity or disinterestedness. When she was questioned about her knowledge of the case by the attorney for the defendant after the suit was brought, she denied knowing anything about it and refused to give any information whatever. Her story as a whole is an iteration and reiteration of alleged general and indefinite statements of the deceased which are not such as are likely to have been uttered by a man of his habits of life and clearheadedness. According to her testimony he said that his property in Springfield belonged to the boy and his property in New York belonged to his blood kin. Yet he specified neither, although he had a perfect knowledge of the kind and extent of the property in lands, notes, money and bank deposits belonging to himself and where deposited and in what names. If her statement is true he made no reference whatever to lots owned by him in Springfield, nor the money in the bank, and did not call on the person in charge of it to hold it or turn it over to the boy. Nor did he suggest the making of a deed to three other lots or tracts of land owned by him in that city, although on the 15th of February when he did agree to give the boy the residence, he at once called his real estate agent to come out and prepare the deed, and read it over carefully, signed it, acknowledged it and ordered it to be recorded. For these reasons we find it impossible to credit the account given by the night nurse and other witnesses for plaintiff, of the sayings of James Burge on the 22nd of February.

On the other hand, we believe that the account given by his brother and brother's wife, and his sister-in-law, of the events of that day, is in accordance with the facts. His sister-in-law was a very old woman of exemplary life and character. She had donated a

hospital of fifty rooms to the City of Springfield. She had never shown the slightest indication of self-seeking in her conduct towards James Burge. She seems to have had ample fortune and to have had a genuine regard for her brother-in-law and to have treated him with great kindness and wholly without any selfish motives. His brother was his chief adviser in his business matters in New York and the two had a strong affection for each other. The statements which he made to these witnesses are clear, simple and direct and such as are not unnatural to a man of his type, close fisted and penurious in his dealings, but plain and simple in speech, who was telling his brother how his leavings should be disposed of in simple terms and in the most inexpensive manner.

## IV.

Neither have we any confidence in the statements made by the night nurse and Mrs. Northrip, that he said to them on Saturday the 18th of February, in the absence of all other persons, that his house had been robbed by his sister-in-law and the real estate agent and that the boy would have trouble but in the end would get the better of them. The improbability of these statements is clear to our minds from the fact that thereafter and up to the time of his death and especially on the 22nd of February, he showed the fullest trust in his sister-in-law and his real estate agent; and after explaining to his brother the simple process of dividing the money and effects which they had removed, so that his brother's children and his nephew's children should share equally with their fathers, he said to his brother, that Davies, the real estate agent, and Ellen, his sister-in-law, knew exactly what he wanted done with it.

*Credibility of Witnesses.*

255 Mo. 43

## V.

We see no escape from the conclusion that the alleged declarations claimed by plaintiff's witnesses to have been made by James Burge were not proven by testimony so clear and cogent as to banish all reasonable doubt of its truthfulness from our minds. For that reason, if for no other, plaintiff's case must fail. But we do not wish to be understood by deciding this case on the insufficiency of the proof, that we impliedly admit that a completed verbal trust would have been established in the property sued for, if the words or admissions upon which it was rested had been sustained by that degree of evidence prescribed by law. If that point had been reached, we would not concede that the vague, equivocal, uncertain terms attributed to James Burge would have created a verbal trust *in praesenti* to the property in suit in favor of the plaintiff. There is no meaning which can be rationally attached to the alleged admissions or declarations of James Burge, which necessarily carries the idea of an intention and act on his part of present transfer of the equitable title to his money and other personal property to the plaintiff. Without that, self-evidently no completed trust enforceable against him or his estate could arise under the principles of equity governing the creation of trusts in personalty by express oral grant.

The judgment in this case is reversed. All concur.